IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 1, 2008 Session

## STATE OF TENNESSEE v. ALVIN MALONE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00684    W. Fred Axley, Judge**

**No. W2007-01119-CCA-R3-CD  - Filed October 2, 2008**

The defendant, Alvin Malone, was convicted by a Shelby County jury of two counts of first degree felony murder, one count of first degree premeditated murder, and two counts of especially aggravated kidnapping.  The defendant's first degree premeditated murder conviction merged into one of the felony murder convictions by operation of law, and he was sentenced to two life sentences and two twenty-year sentences, to be served consecutively in the Department of Correction.  On appeal, the defendant argues that: (1) the trial court erred in excluding statements of two unavailable witnesses; (2) the trial court erred in not granting a continuance; (3) the trial court erred in allowing the State to amend two counts of the indictment; (4) the trial court erred in allowing the State to impeach its own witness without giving a contemporaneous limiting instruction; (5) the trial court erred in allowing testimony concerning cartels and drug activity; (6) the trial court erred in not giving a jury charge on self-defense; (7) the evidence was insufficient to support his convictions; and (8) the trial court improperly applied an enhancement factor in sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Randall B. Tolley (on appeal) and Bill Anderson (at trial), Memphis, Tennessee, for the appellant, Alvin Malone.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reggie Henderson and David Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS
**State's Proof**

On January 24, 2005, Memphis Police Officer Willie Miles responded to a homicide call at a church on Carlton Road. In a car parked behind the church, Officer Miles discovered a deceased African-American male, later identified as Taurus Vester, slumped over in the right rear seat of the car. Vester had sustained some gunshot wounds, and gray duct tape had been wrapped around his wrists. Officer Miles noted that both the driver's and passenger's side windows of the car had been broken out and glass was in both seats. Officer Miles recalled that an unknown sum of money was recovered from Vester and that a gunshot residue test was performed on his hands. On cross-examination, Officer Miles could not explain how "the coat that was draped over" Vester's arms only had duct tape on one sleeve if both of Vester's wrists had been bound.

Officer Miles stated that the car was taken to the Crime Response Office for further examination, during which a deceased African-American female, later identified as Vester's girlfriend, Octavia Lynn Nelson, was found in the trunk. From the positioning of Nelson's body, Officer Miles surmised that she had been forced into the trunk. Officer Miles explained that Nelson's knees were bent and her feet were in an upward position, and she had sustained a single gunshot wound to the upper part of her chest. Officer Miles said that he observed "duct tape either on [Nelson] . . . or in the trunk." However, he did not see any glass particles in the trunk or on Nelson's clothing.

Andre Adams, a longtime friend of Vester, testified that in early January 2005 he learned from Vester that a man named "Al" had some cocaine in his house and owed a man of Mexican descent a large sum of money. Upon learning this information, Adams developed a plan to break into Al's house and steal the cocaine. Adams and a friend, Dexter Williams, watched Al's house, and, when it was empty, Adams kicked down the front door and took a safe he found in a closet. The safe contained three kilograms of cocaine, which Adams split amongst himself, Williams, and another friend, Shawn Brimberry, as well as seven dollars. Approximately twenty-four hours after he stole the cocaine, Adams learned that Vester was dead. Adams admitted that he was presently in federal custody on a gun charge. Adams said that he did not tell Vester that he broke into Al's house, nor did Vester receive any of the stolen cocaine.

Testifying through an interpreter, Orel Chapa said that he moved to Memphis from Texas in 2003 and began selling marijuana in 2004. Chapa was introduced to the defendant sometime during the middle of 2004 because the defendant wanted to purchase marijuana, and thereafter Chapa sold marijuana to the defendant "[p]lenty of times." Chapa recalled that, in December 2004, the defendant owed him approximately $12,000 for marijuana and a "quarter kilo of cocaine." Chapa explained that he would give the defendant marijuana and the defendant would pay for it later. Chapa said that he received his cocaine from Beto, who was also called Cesar, and Chino. According to Chapa, Chino got cocaine from the "cartel in El Paso" and delivered it to Beto in Memphis who was then "in charge of delivering here to the different places." Chapa testified that he met Vester at a friend's house during the latter months of 2004 and, about two weeks later, Vester started helping him sell marijuana.

Chapa recalled that the first time he went to the defendant's house to collect the money the defendant owed him, the defendant showed him "three kilos . . . and a quarter of cocaine and a bunch of money." The cocaine was marked with an alligator or "Lacosee," which was the stamp of the cartel from which Chino obtained his drugs. Chapa stated that he asked the defendant to pay him, but the defendant "said that he would pay me later on because he had other people before me that he had to pay." The defendant asked Chapa for more marijuana to sell, but Chapa told him that "he had to pay me before I give him anything else."

Chapa testified that he went back to the defendant's house a second time, this time with Vester, in an effort to collect his money from the defendant. Chapa told Vester that the defendant had a safe in his bedroom that contained "3 kilos and a quarter of cocaine," but he told Vester to only take the money "[b]ecause if you touch the cocaine it's going to be problems and they will come from Mexico." Chapa reiterated, "[I]f we stole the cocaine we were going to have problems. They could kill us, just like it happened. I only wanted the money." After a "struggle," Chapa and Vester left the defendant's house without getting the money the defendant owed. Later, the defendant called Chapa and said "he was going to kidnap my mother and that I will have to pay him $7,000. And that the money that he owed me, he was not going to pay me." Chapa was concerned because he owed his drug suppliers money and "[t]hey could kill me."

Chapa testified that on January 15 or 17, 2005, Chino, Beto, and two or three other Hispanic men, armed with pistols and looking for the drugs that had been stolen from the defendant, came to his house on Willow Street. The defendant arrived about five minutes later, wielding a pistol and threatening to kill Chapa. The men put Chapa in a vehicle and the defendant accused Chapa of stealing the drugs. Chapa told the defendant that he had "not stolen anything because [he] knew what [would] happen if [he] did." After Chapa explained that he had not taken the drugs, the men took Chapa and his mother to a hotel and told them not to leave. The men told Chapa to call Vester because they needed "to check the merchandise that he had."

Chapa relayed that Vester owed him between $3000 and $5000 for cocaine and marijuana from mid-December and that Vester avoided his phone calls. However, on January 22 or 23, Vester called Chapa and said that he had money and cocaine. Chapa thought that Vester must have stolen the cocaine from the defendant because only Chino, Beto, Vester, and he knew where the defendant kept it and Chino and Beto would "not steal it because they were the owners." Chapa stated that Chino, who "comes from Mexico and . . . knows the brand of his merchandise," later tested Vester's cocaine and determined that it was the same as the defendant's. Chapa testified that after Chino, Beto, and the defendant realized that Vester's cocaine was the same, "[t]hey told me that I will have to call Vester to go to my house because they were going to take him. If I don't do that, they will kill me and my mother." Chapa elaborated that he talked to someone from Mexico on the phone who "told me I had 24 hours. So I can give that merchandise back or they will kill me and my mother."

Chapa testified that he called Vester and asked him to "come in my home to bring me an ounce of crack because a friend was going to buy it and that friend was [the defendant]." Chapa

recalled that Chino and Beto were already at his house when Vester arrived, and the defendant arrived about ten minutes later. Chapa stated that the defendant "came and he had a pistol. And he told [Vester] to get on his knees and the hands on the floor. And Beto and Chino, they bound him with tape in the -- his hands and his mouth." Chapa clarified that Beto and Chino tied Vester up with tape, and the defendant and Chino ordered Vester to the ground. Chapa noted that Beto, Chino, and the defendant all had guns.

Chapa testified that the other men told him to get Nelson out of the car. Nelson was sitting in the passenger's side seat of the car, and Chapa used a "tube" to break out the window but could not grab her because she moved to the driver's seat. As Chapa was breaking out the driver's side window, Chino and the defendant came outside and helped get Nelson out of the car. Chapa elaborated, "Chino got there and [the defendant] and they threw her on the floor and they took her inside and they bound her hands, her feet, and also tape[d] her mouth." Chapa noted that Chino and the defendant had guns with them the entire time. Chapa said that he left the tube in his front yard and that most of the broken glass from the windows went in the driveway.

Chapa further testified that once Vester and Nelson were taped up, Chino moved Vester's car to the back of the house, and they all got in Chino's maroon-colored Envoy. Chapa explained that Vester's hands were duct-taped in front, but he could still move them, and Nelson's hands were bound behind her back. Chapa stated that he drove the Envoy, the defendant was in the passenger seat, and "[i]n the back was Chino, [Nelson], Vester, and Beto." He explained that Chino was seated behind him, and Beto was seated behind the defendant. Chapa stated, "We left the house. Not far away, Vester struggled with . . . Beto. And he took the gun and I heard like one or two shots. And [the defendant] and . . . Beto, . . . and Chino, they started sho[o]ting with Vester." Chapa reiterated that he saw the defendant point his gun toward the backseat at Vester and fire. Chapa said that the shooting took place inside the Envoy about one-half block from his house.

Chapa recalled that they then went to the defendant's auto body shop on Elvis Presley Boulevard at which point he parked the vehicle and Chino told him to get out. Chapa got out of the vehicle, and Chino got into the driver's seat and closed the door. Chapa heard two shots from inside the Envoy but did not see who fired the shots. Asked who was in the vehicle with Chino, Chapa responded, "[The defendant] in the passenger side. Beto in the back. Vester already dead and [Nelson]." Chapa recalled that Nelson was still alive when he got out of the vehicle. Chapa said that Chino, Beto, and the defendant each still had their guns when he got of the vehicle. He thought the defendant's gun was a nine-millimeter and Beto's was a .380, but he did not know what kind of gun Chino had. Chapa testified that these events all occurred on January 23 or 24, 2005.

Chapa testified that the defendant then drove him, Chino, and Beto to Chino and Beto's apartment. Chapa recalled that Beto had been shot in the leg during the course of events in the Envoy. He explained that the defendant's car had been brought to the auto body shop by a colleague of the defendant who stayed to watch the bodies and that was the car they took to Chino and Beto's apartment. Chapa recalled that they stayed at the apartment for two or three days, during which time the dead bodies of Vester and Nelson remained at the body shop. The morning after the murders,

a young woman who was with Chino took Chapa to get his car from his house. Chapa then drove his car to meet the defendant at an AutoZone store, and the defendant gave him $100. Chapa said that he left Chino and Beto's apartment for good the day the authorities found the dead bodies. On that day, Chapa met the defendant at a gas station, and the defendant "told me that I should leave here because Chino wanted to kill me." Chapa continued, "At that moment my mom picked me up. My mom had been following us. . . . We threw out the car. Threw away the car. We went to Mississippi to some trailer. We asked for help. They let us sleep there for that night. And in the morning, very early, [the defendant] came to pick us up. And he took us to the place where the bus was leaving for Houston. . . ."

Chapa and his mother traveled by bus to Houston, Texas, where he was subsequently arrested for the murders of Vester and Nelson. Chapa admitted that he initially did not tell the authorities the whole story about what happened to Vester and Nelson but said he ultimately did tell the truth. When asked about a picture of the defendant officers in Memphis had shown him, Chapa said that he wrote what he did on it because the defendant was the person "[t]hat kill[ed] Vester." Chapa's writing was translated by the interpreter as, "This is the man that I know under the name of Al and Tony. He was the one who wanted to kill me, kill me first. And under threats they made me call 'T' so to kill him. And I saw him -- and I saw him making -- doing the shots." Chapa noted that "T" was Vester's nickname.

Dr. Kenneth Snell, an expert in the field of forensic pathology, testified that he worked for the Shelby County Medical Examiner at the time of the murders and performed the autopsies of the two victims. Dr. Snell recalled that he went to the police impound yard on January 24, 2005, "to investigate a decedent . . . in a vehicle." Dr. Snell found Vester "in a seated position leaning slightly forward in the backseat . . . leaning against the right rear door with his back against the door." Vester's body was in "full rigor," which is generally reached in approximately eight hours after death. Dr. Snell noted that Vester's jacket had what appeared to be a bullet hole in the left front part of the jacket where a pocket would be located. Dr. Snell also noted that there was duct tape on the jacket and that the tape was totally attached to the jacket and not Vester's skin. The autopsy of Vester's body revealed four gunshot entrance wounds and two exit wounds. Dr. Snell pointed out entrance wounds in Vester's right upper chest, right upper abdominal quadrant, the mid-line of the chest, and the left lower abdominal quadrant. Dr. Snell determined that the fatal shot was the one that entered the left lower abdominal quadrant and punctured the liver, heart, and lungs. Dr. Snell removed both a medium and a large caliber projectile from the body. The two different calibers indicated to Dr. Snell that two different weapons had been used. Dr. Snell surmised from the bullet pathways through Vester's body that "coming from [Vester's] left side there's two different weapons. One's up higher and one's down lower."

Dr. Snell testified that while he was at the police impound yard recovering Vester's body, an officer opened the trunk and discovered Nelson's body in a facedown position. Nelson had suffered a gunshot wound to the chest, with the bullet going through her heart and esophagus. A large caliber projectile was recovered from her body. Nelson was six weeks pregnant at the time of her death.

On cross-examination, Dr. Snell acknowledged that he did not "match up the clothing with the angles of the wounds." Asked whether damage to clothing was important to determine the distance from which a weapon was fired, Dr. Snell said that was "something for a forensic ballistic[s] expert." Dr. Snell noted that "in [his] report there's comment that there was no powder stippling or soot associated with any of [the wounds] on any of the cases," meaning the wounds could either be classified as "a distant wound or an indeterminate range." He explained that indeterminate "means . . . that clothing when present can reduce or eliminate soot or stippling from hitting the skin if you're within that range." The autopsy of Nelson's body did not reveal any type of glass. However, Dr. Snell agreed on redirect that glass, if initially present, could have fallen off if Nelson had moved around.

Maria Guadalupe Graza Aguero,[1] Chapa's mother, testified that sometime toward the end of January 2005 three people, identified as "Michael, Chino and Cesar," came to the house she shared with Chapa. She said that another person, "Ali or Alvin Malone," came later. Aguero recalled that the men were arguing and that "[w]hen Ali went there . . . he attacked my son. . . . And he was shouting kill him, kill him. And he was threatening him with a pistol." Chino then grabbed Chapa and "took him out of the house." Aguero went to a neighbor's house to ask for help but received no answer at the door, so she drove to a club to look for a friend, but the club was closed. Aguero returned home to find that the men were back at the house. According to Aguero, the men all left again and someone took her and Chapa to a hotel. Aguero testified that Chapa was afraid to stay at the hotel, so they later left and she stayed with a friend and Chapa went home. Chapa subsequently called her at work and said that he was in danger and that they had to leave Memphis. Aguero recalled that the defendant took her and Chapa "to a town in Mississippi. And he gave us some money, 500 to each other, and he bought a ticket to Houston and then he waited until the bus had left." Aguero acknowledged that the defendant bought her and Chapa's bus tickets to Houston.

Aguero testified that she talked to the police in September of 2005 and identified Chino and the defendant from a photo spread. On the photograph of the defendant, Aguero wrote:

> I believe that it is Ali or Alvin Malone who entered my house one Friday early morning wanting to kill my son. And I saw him later. It was he who took us from Memphis and took to Mississippi to take a bus en route to Houston and he gave $500 to me and $500 to my son. And he told us to get out of here cause they were going to kill us. And that Cesar or Beto was dead in Cd Juarez.[2]

On cross-examination, Aguero testified that she met Vester sometime in January 2005 and knew that he and her son were friends. Aguero acknowledged that Chapa sold drugs and used to smoke crack cocaine but said he did not start smoking again until after he met Vester. She also acknowledged that Chapa was charged with the murders of Vester and Nelson and said she became

---

[1]Aguero also testified through a Spanish interpreter.

[2]Aguero's writing was actually in Spanish; therefore, this is the writing as interpreted by the translator.

aware that he was a suspect after they had left town. Aguero said that she then went to Mexico because she "was very frightened. My son did not want me to return because they had threatened him and told me to remain there."

Recalling the events leading up to her and Chapa leaving Memphis, Aguero stated that Chapa called her and she went to a gas station where she received another call from Chapa directing her to a "staffing area called Talent Force." Chapa told her that "he was with Ali" at Talent Force, but she did not see him specifically. From there, Aguero and Chapa drove from place to place until they ultimately abandoned their car near "some trailer houses" in Bartlett. A Hispanic person they did not know picked them up and took them to "a place where many Hispanics live outside Memphis" where they stayed the night. The next day, Chapa called the defendant because "he had no other option" and had the defendant pick them up "by the highway" and take them to "[a] place in Mississippi." Asked why, on the photograph she identified for the officers in September 2005, she wrote "I believe" it is Alvin Malone instead of "I know," Aguero responded, "In that moment I didn't think of how I was writing it. In that moment I only wrote what I knew was true. And I know that that word 'I believe' is wrong because I know."

Cynthia Tijerina testified that on January 11, 2005, she rented a maroon GMC Envoy in El Paso, Texas, for her boyfriend Chino, who was also known as Daniel Lopez. Tijerina's understanding as to why she rented the Envoy was so Chino "could go visit his kids" while in El Paso. Tijerina stated that Chino apparently left El Paso in the Envoy because he called her from Memphis. She had only rented the vehicle for a week and was concerned because the rental car company started calling her wanting the vehicle back. The Envoy was eventually returned to the rental company on February 8, 2005. Tijerina recalled that the Envoy was in "brand new" condition and only had 200 or 300 miles on it when she rented it. However, when it was returned to her, the vehicle had "a couple of holes" and "one of [the] seats in the backseat was stained." She elaborated that the holes were on the "driver and the passenger seat." In the vehicle, she also found a "gun clip" containing bullets that was not in the vehicle when she rented it. Tijerina said that she did not clean the car or try to fix it before returning it, but she kept the gun clip and "gave it to the detectives that went down to El Paso."

Tijerina recalled that she talked to the defendant in April 2005 at Chino's apartment in Memphis. During that conversation, the defendant told Tijerina that "somebody was trying to kill Chino and that he wasn't going to let it happen." He said that "he had killed for Chino before and that he would do it again. That he wasn't going to let nobody else cut off his water."[3] Tijerina acknowledged that she was shown a photo spread in December 2005, from which she identified the defendant. On the defendant's photograph, Tijerina wrote, "[T]his is Alvin Malone. . . . Alvin Malone told me that he had killed two people and that he had done it for Chino." She said that the defendant did not tell her how or where he had killed the two people. However, Tijerina admitted that she gave a statement to investigators on December 14, 2005, in El Paso, in which she said:

_____

[3]Tijerina explained that "water" meant "drug supply."

Alvin, 2 Short, was telling me this that he wasn't going to let it happen.  He wasn't going to let nobody cut off his water.  That he had killed people before for Chino and that he would do it again.  So I didn't know what he was referring to and I had asked him what two people, and he told me that he had killed two people cause they weren't going to cut off his water and that it was him that had done it and they were in the maroon Envoy because I had asked him what truck they were in because I was trying to connect because I didn't know . . . so I asked what they were in and he told me that they were in the maroon Envoy.  That's when I told him that it was my truck and that I had turned it in and he kind of surprised.  He acted kind of surprised because I had told him I had turned in the truck the way it was.

Asked why she had said earlier that she did not know where the murders took place, Tijerina stated, "At exactly that point and time exactly what had happened or I didn't know exactly what had happened, no."

On cross-examination, Tijerina acknowledged that she did not inform the rental car company that someone other than herself would be driving the Envoy.  Asked how she eventually got the Envoy back, Tijerina explained that she "picked it up from some girls in Dallas" – that Chino told her "to go to Dallas and meet those girls there and that they were going to leave the Envoy with me there."  Tijerina stated that she was mad at Chino for keeping the vehicle too long and then not driving it back to her himself.  When she got back to El Paso, Tijerina looked the vehicle over and noticed a hole in the back of the front passenger seat, a hole in the seat part of the front passenger seat, cigarette burns, and a brown stain on the seat part of the rear seat on the passenger side.  She said the stain looked like a coffee stain "like something had run weird."  After her recollection was refreshed with her December 14, 2005, statement to police, Tijerina admitted that she did have the vehicle cleaned before she turned it in contrary to her earlier testimony.

Tijerina testified that she asked Chino what happened to the vehicle but did not get a satisfactory answer from him.  Tijerina said that she told the rental car company that her children had damaged the car.  According to Tijerina, Chino said the gun clip found in the car belonged to the defendant.  Tijerina recalled that Chino visited El Paso for one to two weeks in late February 2005 and then returned to Memphis because he "just had to come and do things up here."  Chino returned to El Paso again in June, but during the interim, Tijerina visited him in Memphis a "couple of times."  Tijerina admitted that Chino was a drug dealer and that she had never known him to do anything else.  Tijerina also admitted that she did not contact the authorities after the defendant told her about the murders that took place in her rental car.

Lieutenant Paul Feist of the Albuquerque, New Mexico, Police Department, "an expert in the area of crime scene," testified that in December 2005, the Memphis Police Department asked him to examine a maroon Envoy in connection with a double homicide investigation.  Lieutenant Feist noted that at one time the Envoy had been a rental car but was later sold to a resident of Albuquerque.  He also noted that "the front dashboard area . . . had some damage and had been replaced" since the time it had been used as a rental.

Lieutenant Feist stated that he unstitched the fabric on the front passenger seat and discovered a defect in the "inner foam area . . . as well as a tracking . . . a constant hole." The hole continued the "entire length of that seat down through the back of the seat from the top corner, coming out of the inner part of the back and then into the cushion of the seat." From there, the "hole continued through the bottom of the seat and then struck the frame underneath the seat." Lieutenant Feist also noted a "discoloration around [the] defect or a hole that is in the cushion." Lieutenant Feist removed the seat from the vehicle completely but did not find "any object that would create that defect in the seat." He also found a defect in the passenger side rear seat with the "trajectory . . . going in a downward and rearward trajectory or path." There was no discoloration noted around the defect; however, Lieutenant Feist explained that an "intermediate object . . . could have been there that could have prevented a stain from depositing on there." Lieutenant Feist stated that no projectiles or fragments of lead were discovered during his examination. On cross-examination, Lieutenant Feist explained that he did not have a DNA test performed on the stains on the rear seat because the "stain or this substance . . ., again being faint, was more likely being that the fabrics were cleaned, the seats were cleaned."

Dennis Brunson, a detective with the Drug Enforcement Administration ("DEA") in Memphis, testified that he interviewed the defendant on October 26, 2005, in the course of his duties with the DEA. During that interview, the defendant stated that he was part owner of an auto body shop on Elvis Presley Boulevard and that he paid $600 a month rent. The defendant also told Detective Brunson that he had sold a car to Mr. Lopez and that he had worked on the car. Detective Brunson affirmed that Mr. Lopez was also known as Chino.

Detective Freddie Romero of the Memphis Police Department, accepted by the trial court as an expert in gang intelligence and narcotics trafficking, testified that he was bilingual and, while working in Arizona, had posed undercover as a member of a cartel to "make deliveries and facilitate the transactions of dope sells." Detective Romero explained that Hispanic traffickers would receive cocaine or marijuana from Colombia and use Mexican smugglers to transport the drugs into the United States. Detective Romero also explained that a cartel was "like a board of directors . . . a very lucrative organization. . . . [The] board of directors [is] responsible for getting the narcotics into the country . . . [a]nd they'll send out teams . . . to facilitate the s[ale] of these narcotics." He elaborated:

> You come to me as I would be posing as a cartel member. You'd come to me requesting narcotics. You would come to me saying that you're requesting several kilos of cocaine. I would in fact sell you that cocaine and depending how long it took you to sell that cocaine, I would actually front you or give you more cocaine than you could handle. And that's how I would be able to tie you into the organization.
>
> . . . .
>
> In the . . . industry, if you came to me and said I would like to buy one kilo of cocaine, which street value here in Memphis is approximately $20,000. You'd come to me and you'd pay your $20,000 and I would give you, since it's a good faith

-9-

issue, I would give you another kilo. And I would ask you to sell that kilo in like a loan. I would loan it to you. And you would come to me at a later time and you would pay for that second kilo. Once you paid for that second kilo, I figure out that you can sell two kilos in a matter of time, I would give you one, five, ten, depending on how fast you could sell it.

> . . . .

[S]ince it's . . . an organization. I'm the -- if I was one of the board of directors, I'd be responsible for several thousand kilos. My second would be responsible for a hundred thousands. My general might be responsible for a hundred kilos in one particular area. In the Memphis area you might have somebody here that's responsible for 20, 25 kilos. I would pay for those kilos once payment was received. I'm -- they don't care how I got rid of these 25 kilos. I might solicit 20 other people to sell that 25 kilos. And if I don't get my money, they're going to come to me. And they're going to come to that particular subject that's controlling the area. They're saying you owe. Your debt is this.

Detective Romero stated that if a debt was not paid timely, "it's socially acceptable to eliminate problems. . . . If you can't sell these items and pay your debt, then you are a liability. . . . And eliminating a problem is usually they'll commit homicides, numerous homicides to instill the fear, to keep this narcotic trafficking going." Detective Romero testified that cartels identify their drugs by stamping them with "symbols and signs" unique to them. Detective Romero noted that cartels also train people to cook or prepare their drugs so that they can be distinguished from the drugs of other cartels. Detective Romero said that three kilos of cocaine would be worth $60,000 in Memphis and that "there's been homicides created for less than that."

**Defense Proof**

Officer Vernon Van Buren of the Memphis Police Department testified that on January 25, 2005, he was called to a crime scene at 4424 Willow Road. He noticed a shoe print in the backyard, underneath one of the windows, but did not see anything that resembled a metal pipe in the yard. Officer Van Buren collected "cotton swabs of what appeared to be blood on one of the walls inside the house." A "small strip of grey duct tape" and a "roll of grey duct tape" were recovered from the scene. He said he did not dust the duct tape for fingerprints but agreed that it would have been difficult, but not impossible, to obtain prints from a surface like tape.

Former Shelby County Medical Examiner, Dr. O'Brian Cleary Smith, observed Dr. Snell's testimony and reviewed all trial exhibits related to Dr. Snell's testimony. Dr. Smith agreed that the victims died of gunshot wounds but disagreed with the order in which Vester's jacket was removed from his body. Dr. Smith said that he "would have preferred him to have examined the clothing prior to disturbing it. And once it did come off, be able to photograph it in a more advantageous fashion." He also pointed out that "there's an obligation to look for the finer details that point to"

-10-

the secondary crime scene. Dr. Smith stated that if a person was seated in a vehicle and glass was broken next to that person, then he "would expect that either the rectangular fragments of glass, the slivers of glass or some of the injuries that would be produced by having that glass either strike your skin, come into your clothing or slip in your hair would be evident had that occurred." He said that Dr. Snell should have examined the defect in the jacket Vester was wearing and tried to correlate it to a particular wound on the body. Dr. Smith stated that it did not appear that Dr. Snell had examined the victims' wound tracks. He also noted that powder burns from a close range gunshot could still show up through two or three layers of clothing. Asked whether an examination would have revealed some trace of duct tape had the victims in fact been bound with the tape, Dr. Smith testified, "You would hope. You don't always find that." Dr. Smith disagreed with Dr. Snell as to the closeness of the wound to Vester's left lower quadrant of the abdomen. He said that Dr. Snell determined the shot to be a distant gunshot wound; whereas, he believed it to be a contact gunshot wound. Dr. Smith was not able to determine whether Dr. Snell swabbed Vester's hands for gunshot residue. On cross-examination, Dr. Smith agreed that any differences in the manner and method in which Dr. Snell proceeded would not have changed his opinion or Dr. Snell's findings regarding the cause of death of the two victims. Dr. Smith hypothesized, based on his training and experience, that one of the projectiles recovered from Vester was fired from a nine-millimeter and the other from a .40-caliber weapon. He estimated that the projectile recovered from Nelson was fired from a .40-caliber weapon.

The defendant elected not to testify.

## ANALYSIS

In this appeal, the defendant raises eight issues for our review. He argues that: (1) the trial court erred in excluding statements of two unavailable witnesses; (2) the trial court erred in not granting a continuance; (3) the trial court erred in allowing the State to amend two counts of the indictment; (4) the trial court erred in allowing the State to impeach its own witnesses; (5) the trial court erred in allowing testimony concerning cartels and drug activity; (6) the trial court erred in not giving a jury charge on self-defense; (7) the evidence was insufficient to support his convictions; and (8) the trial court improperly applied an enhancement factor in sentencing.

### I. Witness Statements

Prior to trial, the defendant moved to admit the written statements of two unavailable[4] witnesses to impeach codefendant and witness for the State, Orel Chapa. The defendant argued that the two witnesses, Patricia Garcia and Maria Savala, told authorities on January 25, 2005, that Chapa had told them that he was the one who killed the victims. The defendant also pointed out that investigators from the district attorney's office located and interviewed Garcia and Savala in January 2006, and "their statements were . . . essentially the same as those that had been given on January 25th of 2005."

---

[4] The parties stipulated that the witnesses were unavailable.

The defendant sought to introduce the statements under Tennessee Rule of Evidence 804 as a statement against Chapa's interest. The State argued that the statements were hearsay and could not come in as a statement against interest because "that rule applies to the declarant. It cannot be a statement against the interest of someone that the declarant is talking about." The State further pointed out that Chapa was available and would testify at trial, therefore, the defendant would have ample opportunity to cross-examine him. The defendant then argued for admission of Garcia and Savala's statements under Rule 805 regarding hearsay within hearsay. The State countered again that the statements were still not admissible because Chapa was not the declarant. The court denied the defendant's motion, stating, "I still feel that hearsay exception goes to the declarant, the statement of. Mr. Chapa is going to testify. You may pursue that with him, but I don't think that it's clearly what this rule is about and so I will not allow it."

Savala and Garcia's January 25, 2005, statements are included in the record on appeal. The relevant excerpt from Savala's statement is as follows:

Q: Have you received any telephone calls from Orel [Chapa] recently?

A: He called m[e] yesterday (Monday January 24, 2005) around 5:00 p.m. and asked me what I was doing. I told him nothing, and asked him where he was. He told me that he was in a hotel and asked me if I wanted to go with him. I told him no, and he told me, "In God[']s graces you are lucky that I don't have a gun or I would come look for you, you son of a bitch or I'd do to you what I did to that female black." He was always threatening me. He also asked me if I had heard anything that happened at his house on Sunday and I told him no. And he said, "alright, that's good because I shot Ceasar by accident in the leg.'"

The relevant excerpts from Garcia's statement are as follows:

Q: Did you talk with Mr. Chapa on Saturday January 22, 2005 and if so what was the conversation about?

A: Yes around 1:30 p.m. he asked me if I wanted to buy his car, his gray Lincoln. He told me to give him $350.00 and take over the payments because he had to pay his Rent-Way bill because he had to leave. He told me that he had to kill this fucking black guy, son of a bitch because he owed him money and the black guy had threatened to kill his mother and knew where she worked.

. . . .

Q: Have you received any telephone calls from Orel [Chapa] recently?

A: Yes, on Monday about 1:30 p.m. a male Hispanic called and said that he was calling on behalf of Orel. He called me from a phone number 210-237-5357 and told

-12-

me that Orel had said to get some tape that was on top of a TV and pick up some glass that was outside of the house. He told me I could have the TV that was in the kitchen because he wasn't going to live there. He was going to unoccupy that house.

. . . .

Q: Did you find the tape and the glass?

A: I saw some glass in the driveway that looked like it came from a car but I didn't mess with it. I didn't go inside the house because the door was locked.

On appeal, the defendant argues that his right to confrontation was denied because he could not impeach Chapa with these statements and was not allowed to cross-examine Garcia and Savala because there were no charges against him when the statements were taken. He further argues that the trial court's rulings "made Due Process and a fair trial unattainable." He again asserts that Garcia and Savala's statements were admissible as a statement against interest, see Tenn. R. Evid. 804(b)(3), or, alternatively, that his fundamental right to present a defense "trump[s] the hearsay rules." See State v. Brown, 29 S.W.3d 427, 433 (Tenn. 2000). The State argues that Garcia and Savala's statements were not admissible under any hearsay exception and the exclusion of the statements did not violate the defendant's right to present a defense. We agree with the State.

## A. Hearsay

Rule 801(c) of the Tennessee Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. A statement which at the time of its making so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless believing it to be true is admissible if the declarant is unavailable as a witness. Id. 804(b)(3). A declarant is unavailable when, *inter alia*, "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Id. 804(a)(5). "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001), superceded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. Stout, 46 S.W.3d at 697.

The defendant's reliance on Tennessee Rule of Evidence 804(b)(3) for admission of Savala and Garcia's statements is misplaced. As set out above, the defendant is correct in his assertion that statements against interest are admissible if the declarant is unavailable to testify. However, here the declarant of the statement against interest was Chapa, and he was not "unavailable." Chapa testified at trial and was subject to cross-examination by the defense. While Savala and Garcia were

unavailable, the statements they made were not against their interests and the rules do not provide another basis for admitting their statements.

## B. Due Process

The due process clauses of the Sixth and Fourteenth Amendments of the United States Constitution guarantee a criminal defendant the right to present a defense and call favorable witnesses. Brown, 29 S.W.3d at 432. However, this right is not absolute, and the accused must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence. "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Id. (citations omitted). The facts of each case must be scrutinized to determine whether the constitutional right to present evidence has been violated by the exclusion of evidence. A reviewing court must consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion of the evidence is substantially important. Id. at 433-34.

Applying these factors, we first conclude that the excluded statements were not clearly critical to the defense. As excerpted above and contrary to the defendant's brief, Chapa did not clearly admit to murdering either victim and his alleged statements did not exculpate the defendant. His statement to Savala, "I'd do to you what I did to that female black," could just as likely be interpreted as he would pull her out of a car and turn her over to men with guns. Moreover, his alleged statement to Garcia, "that he had to kill this fucking black guy, son of a bitch because he owed him money and the black guy had threatened to kill his mother and knew where she worked," that provided the motive for killing Vester could have just as likely been aimed at the defendant as the proof at trial indicated that the defendant owed him money and had threatened his mother.

Even if we assume that the statements were critical to the defense, the statements bear little indicia of reliability. The veracity of the two witnesses is indeterminable, and the statements were not made under penalty of perjury or while subject to cross-examination. The fact the witnesses could not be located for trial also leaves in doubt whether they would have stood behind their statements. The third factor is closely related to the second and also weighs against the defendant. The hearsay rule serves an important interest in excluding testimony that is untrustworthy. State v. Flood, 219 S.W.3d 307, 319 (Tenn. 2007). "Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." Chambers v. Mississippi, 410 U.S. 284, 298, 93 S. Ct. 1038, 1047 (1973). Balancing these three factors, we conclude that the defendant's right to due process of law was not violated by the exclusion of the statements.

## II. Continuance

After the trial court denied his motion to admit Garcia and Savala's statements, the defendant asked for permission to take an interlocutory appeal to this court. The court denied the defendant's request, and he then asked for additional time to locate the two witnesses. The court denied the continuance and noted that it had given the defendant an investigator three weeks prior for the purpose of locating Garcia and Savala.

The decision to grant or deny a request for a trial continuance rests within the sole discretion of the trial court. State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997) (citing State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991)). We will reverse the trial court's denial of a continuance only upon a showing that the denial was an abuse of discretion, and the defendant was prejudiced by the denial, in that there is a reasonable probability that, had the continuance been granted, the result of the proceeding would have been different. Id. (citing State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990)); State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994).

In denying the defendant's motion for a new trial on this issue, the trial court held:

The Defendant called Tiffany Najera as a witness in the hearing on the motion. Ms. Najera testified as to efforts she made to locate two witnesses, Patricia Garcia and Maria Sa[vala]. Ms. Najera was unable to locate one of the witnesses and determined that the other witness was living in Mexico and did not want to come back to Memphis to be a witness in this trial. It is clear to the Court that these witnesses would not have been available, even if the Court had granted the Defendant's requested continuance.

After review, we conclude that the defendant has failed to demonstrate that he was prejudiced by the trial court's denial of a continuance, *i.e.*, that the result of his trial would have been different had the motion been granted, or that the trial court abused its discretion in denying a continuance. The defendant's own witness at the hearing on the motion for new trial testified that she was unable to locate Garcia and Savala approximately four months after the trial and that her investigation revealed that both women had left town around September 2006 – two months prior to the trial. Moreover, the case had already been pending for nine months, meaning the defendant had sufficient time to prepare for trial prior to his request for a continuance. The defendant is not entitled to relief on this issue.

## III. Amendment to Indictment

The defendant argues that the trial court erred in allowing the State to amend counts two and three of the indictment to reflect the correct date of the offenses over his objection and after the jury had been impaneled. At the start of trial after the reading of the indictment, defense counsel noted that counts two and three of the typed indictment contained ending dates of November 24, 2005, but that the State had verbally read the ending dates of January 24, 2005, which was in accord with the

other three counts. The State argued that it was a clerical error that caused no prejudice to the defendant. Defense counsel asserted that the State should have to prove its case based on the November dates, that it was prosecutorial misconduct for the State to orally change the indictment, and that the defendant should be granted a mistrial or dismissal of the two counts that were misread. The trial court allowed the State to strike through the incorrect dates and insert the correct dates on the two counts, denying both of the defendant's motions.

Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

Tennessee Rule of Criminal Procedure 7(b) allows for an indictment to be amended without the defendant's consent only if "no additional or different offense is charged and no substantial right of the defendant is prejudiced" and if done so before jeopardy attaches. In a jury case, jeopardy attaches when the jury is impaneled and sworn. State v. Lindsey, 208 S.W.3d 432, 439 (Tenn. Crim. App. 2006) (citing State v. Todd, 654 S.W.2d 379, 382 (Tenn. 1983)). However, an indictment can be amended to "correct a typographical omission which was an unnecessary amendment is an exception to the rule that amendments are not allowed over the objection of a defendant once jeopardy has attached." State v. Brown, 795 S.W.2d 689, 695 (Tenn. Crim. App. 1990); State v. Lane, 673 S.W.2d 874, 875 (Tenn. Crim. App. 1983).

Unless the time is a material element of the offense, "[t]he time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment[.]" Tenn. Code Ann. § 40-13-207. Because there is no requirement that the date be alleged in the indictment, it follows that the amendment of a date is an unnecessary amendment. See Lane, 673 S.W.2d at 875; Jeffries v. State, 640 S.W.2d 854, 856 (Tenn. Crim. App. 1979). Moreover, allowing an unnecessary amendment does not constitute reversible error. Lane, 673 S.W.2d at 875.

Count two of the indictment, in pertinent part, originally read:

[D]uring the period of time between the dates of January 22, 2005 and November 24, 2005 in Shelby County, Tennessee, and before the finding of this indictment, did

-16-

unlawfully and with the intent to commit Kidnapping kill OCTAVIA NELSON during the perpetration of Kidnapping, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee.

Count three of the indictment, in pertinent part, originally read:

[D]uring the period of time between the dates of January 22, 2005 and November 24, 2005 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully, intentionally, and with premeditation kill OCTAVIA NELSON, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee.

The grand jury returned the indictments against the defendant in January 2006; therefore, even as incorrectly alleged the offenses occurred prior to the finding of the indictment. From the record, there is no indication that the defendant relied on the November date in preparing his defense, and we discern no prejudice to the defendant in terms of being apprised of the charges against him or protection against subsequent prosecution for the same offense. We cannot conclude that the trial court abused its discretion in failing to grant a mistrial, and we will not reverse on the basis of the court's allowing unnecessary amendments to the indictment.

Regarding the defendant's allegation that the State's verbally correcting the indictment amounted to prosecutorial misconduct, we are unpersuaded. We first note that other than the sentence, "A mistrial may be granted upon misconduct of a prosecutor. State v. Grooms[, 653 S.W.2d 271 (Tenn. Crim. App. 1983)]," the defendant has not offered any argument or legal authority in support of his claim that the prosecutor's specific conduct amounted to prosecutorial misconduct. In fact, the only other mention of prosecutorial misconduct is the sentence, "The defense argued prosecutorial misconduct as well," in his recap of the events at trial. In any event, when we review allegations of prosecutorial misconduct, we consider "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). In light of our analysis above that a specific date is not even necessary in an indictment, we cannot conclude that the prosecutor's conduct affected the verdict to the prejudice of the defendant. The defendant is not entitled to relief on this issue.

### IV. Witness's Prior Statement

The defendant argues that the trial court erred in allowing the State to impeach Cynthia Tijerina on a prior inconsistent statement without giving a contemporaneous instruction to the jury that the prior statement could only be used for determining the witness's credibility. Although lengthy, in order to properly address this issue, it is important to detail the portions of the court record in question. During the State's direct examination of Tijerina, the following exchange occurred:

Q: All right. Now, do you know a person, Alvin Malone also known as 2 Short?

A: Yes, sir.

. . . .

Q: Did you have an occasion to talk to him back in April of 2005?

A: Yes.

. . . .

Q: And where was this conversation?

A: In Chino's apartment.

. . . .

Q: And what did Mr. Malone tell you?

A. We were -- the whole discussion or just exactly what?

Q: Well, what did he say?

A: That somebody was trying to kill Chino and that he wasn't going to let it happen.

Q: Okay. What else did he say?

A: That he had killed for Chino again and he would -- he had killed for Chino before and that he would do it again. That he wasn't going to let nobody else cut off his water.

Q: Cut off his water. What did you take that to mean?

A: His supply.

Q: Excuse me?

A: His drug supply.

Q: His drug supply. Did he mention about where he had killed these two people?

A: Did he -- no.

Q: Let me -- when you -- back in December of 2005, did you have an occasion to talk with the police and/or investigators in which you were shown a photo spread?

A: Yes, sir.

Q: And in that photo spread, did you identify someone?

A: Yes.

Q: And did you identify Alvin Malone?

A: Yes, I did.

Q: Let me pass you a document and ask you whether or not you recognize it. Do you recognize that document that was passed to you?

A: Yes, sir.

Q: And what is that?

A: A picture of Alvin Malone.

Q: Okay. Is that the picture that you identified back in December of 2005?

A: Yes, sir.

Q: Did you sign it and write on it?

A: Yes, sir, I did.

. . . .

Q: The photograph is not very clear but can you read the writing that's on there, Ms. Tijerina?

A: Yes, sir.

Q: And what does that say?

A: It says this is Alvin Malone. I said that (indiscernible) knew him as 2 Short. Alvin Malone told me that he had killed two people and that he had done it for Chino.

-19-

Q: And is that your signature at the bottom of that?

A: Yes, sir.

Q: Now, when he told you about that he had killed two people because he wasn't going to let his water be cut off, did he tell you how and where he did it?

A: No.

[DEFENSE COUNSEL]: Objection, Your Honor, asked and answered.

Q: Did you –

THE COURT: There was an objection. Do you want to respond?

[THE STATE]: Well, Judge, I was laying a foundation.

THE COURT: The objection was that you had asked the question before and received an answer.

[THE STATE]: Exactly, Judge.

THE COURT: Do you want to respond?

[THE STATE]: Yes. I was laying a foundation for refreshing the witness[']s –

THE COURT: To be followed by another question?

[THE STATE]: Yes, sir, Judge. I couldn't do it without asking that.

THE COURT: It's askable if he's laying a foundation. If he doesn't lay it, I'm going to instruct the jury they can't consider it.

[DEFENSE COUNSEL]: I object. It's improper trying to rehabilitate his own witness.

THE COURT: Rehabilitate?

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: He's laying a foundation.

[DEFENSE COUNSEL]: The question has already been asked and answered by the witness.

THE COURT: But if he's –

[DEFENSE COUNSEL]: He didn't like the answer so he's trying a different tactic is what I'm saying, Judge.

THE COURT: If he's laying a foundation to go into another subject of presentation of evidence, he's allowed to ask that question followed by other questions.

[DEFENSE COUNSEL]: Yes, sir. I don't think he's asking about other evidence. He's asking about the same thing –

[THE STATE]: Judge, what I am doing is the witness had answered the question regarding this killing. And I was going -- maybe I should approach the bench.

. . . .

[THE STATE]: I guess technically we call it impeaching a witness, which you're allowed to do. What I was getting at, I had to ask that question to get that answer, but then I was going to say do you recall giving a statement to police and/or investigators, you know, just like that photo spread at such and such a time? Yes. And at that time do you recall saying that -- she explained, you know, where this killing that took place, which would be what is in the statement. That's what I was doing but it wasn't any way to get to that without asking her that question. It's --

THE COURT: No. I know. I'm just -- I'm trying to determine whether or not she's answered it. She did say no.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: Then you have something that's contrary?

[THE STATE]: Exactly.

THE COURT: He's allowed to do that.

[DEFENSE COUNSEL]: I respectfully disagree. He's not allowed to impeach his own witness without laying the proper foundation –

THE COURT: That's what he's trying to do.

-21-

[DEFENSE COUNSEL]:  And that being that she is a hostile witness.

[THE STATE]:  That's no longer the law, Judge.

THE COURT:  No, it's not.  It used to be.  Did you know that?

[DEFENSE COUNSEL]:  No, sir.

THE COURT:  It used to be.

[DEFENSE COUNSEL]:  Oh, I know it used to be.  I think under these circumstances I'd still make the same objection –

The State then continued its examination by asking Tijerina if she remembered giving a statement to police on December 14, 2005, to which she responded that she did.[5]  The following exchange ensued:

Q:  And at that time do you recall them asking you about Alvin or 2 Short, and they asked, this is Alvin telling you this, referring to about the killing.  Do you recall that?

A:  Yes, sir.

Q:  And I had asked you earlier about where this killing took place and you said you didn't know?

A:  No, sir.

Q: All right.  Do you recall giving this answer Alvin, 2 Short, was telling me this that he wasn't going to let it happen.  He wasn't going to let nobody cut off his water. That he had killed people before for Chino and that he would do it again.  So I didn't know what he was referring to and I had asked him what two people, and he told me that he had killed two people cause they weren't going to cut off his water and that it was him that had done it and they were in the maroon Envoy because I had asked him what truck they were in because I was trying to connect because I didn't know the (indiscernible) so I asked what they were in and he told me that they were in the maroon Envoy.  That's when I told him that it was my truck and that I had turned it in and he kind of surprised.  He acted kind of surprised because I told him I had turned in the truck the way it was.  Do you recall giving . . . the officers that answer about where it was?

A:  Yes, sir.

_____

[5]The statement itself was not admitted into evidence.

-22-

Q: All right. So then when you told me earlier that you didn't know where it was, did you just not recall or you didn't understand what I was asking?

A: At exactly that point and time exactly what had happened or I didn't know exactly what had happened, no.

Q: But as far as where it was and what I just read about –

A: Was in the truck, yeah. I'm sorry.

Q: -- it being in the maroon -- was that true?

A: Uh-huh.

Tennessee Rules of Evidence 612 and 613 establish the circumstances and procedures for refreshing the memory of a witness using a prior statement of the witness. Rule 612 explains the procedures when a witness uses a writing to refresh his or her memory, "If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. . . ." The Advisory Commission Comment to this section explains the foundation necessary and procedure to be used when the memory of a witness is refreshed by a writing, "Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory."

The use and admissibility of the prior statement of a witness is governed by Tennessee Rule of Evidence 613, which provides in pertinent part:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Tennessee Rule of Evidence 803(5) explains the limited circumstances under which the prior statement may be entered as exhibit in a trial:

Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The Advisory Commission Comment to this subsection explains the showing which must be made before the prior statement of a witness may be used to refresh at trial the recollection of the witness:

The proposed rule recognizes the traditional Tennessee hearsay exception for past recollection recorded, but it expands common law in two respects. It allows the admissibility of the contents of a document reflecting past recollection recorded even though the witness has some recollection of the recorded facts but not enough to testify "fully and accurately." Second, it permits the witness to adopt a record made by another not acting under the witness's supervision. The safeguard is the requirement of adoption at the time when the witness could vouch for the document's correctness.

Tenn. R. Evid. 803(5), Advisory Commission Cmt.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

Having reviewed the applicable law, we now will consider the defendant's complaint that the trial court erred by not giving a limiting instruction. First, we note that the defendant's initial objection was to "asked and answered," then to "[i]t's improper trying to rehabilitate his own witness,"and finally to "[h]e's not allowed to impeach his own witness without laying the proper foundation . . . . [a]nd that being that she is a hostile witness." The defense never requested a limiting instruction at trial and is therefore in essence alleging a new ground on appeal. It is well-settled that this court will not consider a new theory that was not presented to the trial court. See State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

In any event, it is not entirely clear that the State used Tijerina's statement for impeachment purposes because the majority of the prior statement was actually duplicative of her testimony, and we can discern no logical reason for the State to attack the credibility of one of its crucial witnesses. We acknowledge that the State, at trial, eventually argued it was trying to use the statement for impeachment, but that was after a long and confusing discourse between the attorneys and the court in which a variety of objections and theories were lodged. In actuality, the procedure the State utilized, albeit not succinctly, more closely resembled a blending of the procedures for present recollection refreshed and past recollection recorded. As noted above, the State initially said that it was "laying a foundation for refreshing the witness . . . ."

Regardless, in the context of the overall trial, the additional information that came out of Tijerina's statement was rather innocuous. By this point, the jury had already heard Chapa's entire testimony about the murders and Tijerina's testimony about the defendant telling her that he had murdered two people before for Chino. The additional information that the murders had happened in a maroon Envoy was of little consequence.

In sum, we cannot conclude that the trial court erred by not giving a contemporaneous limiting instruction because it is not evident that the prior statement was actually used for impeachment, and, even if the court did err, the error was harmless in light of the other evidence as set out in this opinion.

### V. Testimony about Cartels and Drug Activity

The defendant next argues that the trial court erred in allowing Detective Romero to "testify as an expert regarding gang activity and drug cartel operations where there was no proof [the defendant] was involved in such activity." He asserts that Detective Romero's testimony was irrelevant and unfairly prejudicial. The State argues that Detective Romero's testimony was useful in helping the jury understand the defendant's motive for kidnapping and killing the victims.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Id. 402. However, even relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. 403. We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

In this case, we conclude that the trial court did not abuse its discretion in allowing Detective Romero's testimony. Chapa testified that his drug supplier was a man named Chino who got his drugs from a cartel in El Paso and that the drugs were embossed with a particular stamp for that cartel. Chapa testified that he had told Vester not to touch the defendant's cocaine because there

would "be problems and they will come from Mexico." Chapa's mother, Aguero, testified that she and Chapa abandoned their home and car and went to Texas because their lives were in danger. The testimony at trial was replete with notions of fear, danger, and drugs. For those with no prior exposure to the drug business, Detective Romero's testimony was helpful in explaining the defendant's motive for kidnapping and killing the victims and explaining why some of the witnesses behaved in certain ways or testified to particular things. See Tenn. R. Evid. 702; see also State v. Justin Mathis, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App. July 20, 2007), perm. to appeal denied (Tenn. Dec. 26, 2007) (expert testimony about gang culture relevant to show defendant's motive or intent for crime). Furthermore, we cannot conclude that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The defendant is not entitled to relief on this issue.

### VI. Jury Instruction

The defendant next argues that the trial court erred in not instructing the jury on self-defense. The State responds that "the evidence, in no way, supports an instruction on self-defense." According to the defendant, the evidence of self-defense was that a gunshot residue test kit showed that Vester had fired a weapon, Chapa testified that Vester took Beto's gun and fired two shots, Beto was shot in the leg by Vester, and shots were fired toward the defendant's seat. The defendant also suggests that "[i]t is important to note that nowhere in Chapa's story, nor in evidence at all, is there any proof that anyone intended to kill Taurus Vester prior to him taking Beto's gun."

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superceded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247 (Tenn. 2002). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

To determine if a statutory defense is "fairly raised by the proof, 'a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence.'" State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998) (quoting State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993)). At the time of the defendant's trial, the defense of self-defense was set out in the Tennessee Code as follows:

> (a) A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The

person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

. . . .

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force . . . .

Tenn. Code Ann. § 39-11-611(a), (d) (2006). The Sentencing Commission Comments to section 39-11-611 elaborate that "[s]ubsections (c) and (d) continue the traditional rule that the defendant claiming justification should be free from fault in bringing on the necessity of using force."

We first note that, contrary to the defendant's assertion, a gunshot residue test kit did not show that Vester had fired a weapon. The testimony of Officer Miles on which the defendant relies was that he observed his partner use a gunshot residue test kit on the male victim and that the purpose was to see if he had fired a weapon. However, Officer Miles said that he did not have the results of the test – "[t]hey are sent off to be tested." Moreover, the remaining proof at trial did not support an instruction on self-defense. The defendant's theory was that he was defending himself when Vester shot at him first; however, the defendant is ignoring the fact that he must be free from fault in order to assert the defense. The proof showed that it was the defendant, along with Chino and Beto, who ordered Vester to the ground, helped pull Nelson out of Vester's car, bound Vester and Nelson with duct tape, and forced them into the Envoy all while armed with guns. This evidence shows that Vester's use of force was provoked by the defendant's actions, and there simply is no evidence that the defendant's actions were an act of self-defense. Accordingly, we conclude that because the defense of self-defense was not fairly raised by the evidence, an instruction as to self-defense was not required. Bult, 989 S.W.2d at 732-33.

## VII. Sufficiency

The defendant next argues that the evidence is insufficient to sustain his convictions. Where sufficiency of the convicting evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In Tennessee, it is well established that a defendant cannot be convicted of a felony on the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994), superceded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81; Sherrill v. State, 321 S.W.2d 811, 815 (Tenn. 1959); State v. Allen, 10 S.W.3d 286, 289 (Tenn. Crim. App. 1999); State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). An accomplice is "an individual who knowingly, voluntarily and with common intent participates with the principal offender in the commission of an offense." State v. Lewis, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000). Whether an accomplice's testimony has been sufficiently corroborated to allow a guilty verdict is a question for the jury. Bigbee, 885 S.W.2d at 803. Our supreme court explained in State v. Shaw, 37 S.W.3d 900 (Tenn. 2001), the nature of the evidence necessary to corroborate inculpatory testimony of a codefendant:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Id. at 903 (quoting Bigbee, 885 S.W.2d at 803).

The defendant was convicted of three counts of first degree murder and two counts of especially aggravated kidnapping. First degree murder is defined as "[a] premeditated and intentional killing of another; [or] "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping . . . ." Tenn. Code Ann. § 39-13-202(a)(1), (2). Especially aggravated kidnapping is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Id. § 39-13-305(a)(1). False imprisonment occurs when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302.

The defendant argues that there were several inconsistencies in Chapa's testimony and that his testimony was not corroborated. First, any inconsistencies in Chapa's testimony were resolved by the jury as the trier of fact. Second, Chapa's testimony was sufficiently corroborated to connect the defendant to the crimes. Chapa's testimony that the defendant was in possession of cocaine was corroborated by Adams. Adams also testified that Vester knew that the defendant had cocaine in his house. Aguero corroborated Chapa's testimony that Beto, Chino, and the defendant came to their house and threatened to kill Chapa and that she and Chapa were taken to a hotel. Aguero also corroborated that she and Chapa went to Mississippi and the defendant put them on a bus to Houston. Tijerina testified that she rented a maroon Envoy for her boyfriend, Chino, who drove the vehicle to Memphis. When the vehicle was returned to her, Tijerina noticed two holes in the seats, a brown-colored stain in the backseat, and a gun clip containing bullets. Tijerina also recalled a conversation with the defendant in which he told her that he had killed two people for Chino. Officer Van Buren testified that he worked a crime scene on January 25, 2005, at 4424 Willow Road, where he recovered a roll of gray duct tape as well as a small strip of gray duct tape. Officer Van Buren also noted blood on one of the walls inside the house.

Regarding the defendant's overall challenge to the sufficiency of the convicting evidence, in the light most favorable to the State, the evidence showed that the defendant was in possession of cocaine from a drug cartel that was subsequently stolen in a burglary. The defendant initially thought Chapa was the thief and wanted to kill him. When Chapa indicated that Vester was the likely thief, Chapa was ordered to lure Vester to Chapa's house. Armed with guns, the defendant, Chino, and Beto ordered Vester to the ground and bound him with duct tape. Nelson was forcibly grabbed out of Vester's car and bound with duct tape as well. Vester and Nelson were forced into Chino's rental vehicle with the defendant, Chino, Beto, and Chapa. While en route to the defendant's auto body shop, an exchange of gunfire took place during which Vester was shot four times. Nelson was shot after the group arrived at the shop at a point when Chino, Beto, and the defendant were the only ones in the vehicle. Even though Chapa did not see who actually fired the deadly shots, the jury was instructed that the defendant could be criminally responsible for the conduct of others. We conclude that the evidence was sufficient to convict the defendant of the kidnapping and murders of Vester and Nelson. The defendant is not entitled to relief on this issue.

-29-

# VIII. Sentencing

The defendant challenges the sentence imposed by the trial court. When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). Enhancement factors may be considered only if they are "appropriate for the offense" and "not already an essential element of the offense." Tenn. Code Ann. § 40-35-114.

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-40, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous. If our review reflects that the trial court, following the statutory sentencing procedure, imposed a lawful sentence, after having given due consideration and proper weight to the factors and principles set out under the sentencing law and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the end of trial, the trial court sentenced the defendant to life imprisonment on each of the murder convictions, to be served consecutively. The trial court then conducted a sentencing hearing on January 18, 2007, to determine the defendant's sentences for his especially aggravated kidnapping convictions. At the hearing, Velvet Vester, Taurus Vester's father, testified that the death of his son had "destroyed" him and his family. Velvet Vester said that, having observed the trial, he was convinced that the defendant was responsible for his son's death. Victim impact statements from the victims' mothers were entered into evidence at the hearing.

The defendant testified that he did not have a good opportunity to sit down and talk to his attorney about the case leading up to trial. He said that the detectives never really talked to him either. Overall, he felt like his attorney did a good job but that ten months was not enough time to get ready for trial. The defendant denied killing Vester and said that the first time he saw him was when he saw his picture at trial. He admitted to having one felony conviction for stealing pecans when he was eighteen years old to buy his son toys for Christmas. The defendant said that his life was in danger because he was involved in a federal drug case involving the same parties.

The trial court enhanced the defendant's sentences for especially aggravated kidnapping, finding he was a leader in the offense, see Tenn. Code Ann. § 40-35-114(2), and imposed consecutive sentences of twenty years on each of the two counts. The defendant argues that the trial court misapplied this enhancement factor because there was no proof he was a "leader" in the offenses. It is our view that we need not address the defendant's specific contention because he received the presumptive sentence for his offenses. The offenses in the present case occurred in January 2005, prior to the effective date of the 2005 sentencing law amendments, but the defendant was sentenced in 2007. Under such circumstances, the defendant could have elected to be sentenced under the new law; however, the record does not contain a written waiver of his ex post facto protections. Therefore, the defendant was subject to the sentencing law in effect at the time of the offenses. See Tenn. Code Ann. § 40-35-114 (2005), Sentencing Commission Cmts.

Especially aggravated kidnapping is a Class A felony. Tenn. Code Ann. § 39-13-305(b)(1). The sentence range for a standard offender convicted of a Class A felony is fifteen to twenty-five years. Id. § 40-35-112(a)(1). Under the pre-amendment law, the presumptive sentence for a Class A felony was the midpoint in the range. See id. § 40-35-210(c). A sentence of twenty years was the midpoint in the range; therefore, the defendant received an appropriate sentence and is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE